UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

KEITH LAMAR JOLLY,

        Petitioner,

v.                                Case No. 3:04-cv-1292-J-12MMH

JAMES R. MCDONOUGH,[1] et al.,

        Respondents.

_____

**ORDER**

**I. Status**

    Petitioner, an inmate of the Florida penal system who is proceeding pro se, initiated this action by filing a Petition for Writ of Habeas Corpus (Doc. #1) pursuant to 28 U.S.C. § 2254 on December 15, 2004.  He is proceeding on an Amended Petition (Doc. #4), filed December 27, 2004.  He challenges his 1999 state court (Duval County) conviction for possession of a firearm by a convicted felon on the following two grounds: (1) the evidence submitted by the state in its case in chief (with the exception of Petitioner's inculpatory statement, which was inadmissible pursuant

_____

    [1] James R. McDonough, the Interim Secretary of the Florida Department of Corrections, is substituted as the proper party Respondent for James V. Crosby, Jr., pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

to the *corpus delicti* rule) was insufficient to establish the elements of the crime charged; and, (2) Petitioner received ineffective assistance of counsel for counsel's failure to object to Officer Todd's testimony regarding Petitioner's inculpatory statement because the state had not yet established that a crime had been committed.

On March 14, 2005, Respondents filed an Answer to Petition for Writ of Habeas Corpus (Doc. #8) (hereinafter Response).  On March 15, 2005, Respondents filed their Exhibits to State's Answer to Petition for Writ of Habeas Corpus (Doc. #10) (hereinafter Ex.). Petitioner's Traverse (Doc. #11) was filed on April 6, 2005.

## II. Relevant Procedural History[2]

On October 9, 1998, Petitioner was charged by information with one count of possession of a firearm by a convicted felon.  Ex. A. On February 10, 1999, after a trial by jury, Petitioner was found guilty as charged.  Ex. D.  Petitioner was adjudicated guilty of this offense and sentenced to be imprisoned for a term of eleven years.  Ex. B.

On direct appeal, Petitioner raised the following issues:

> ISSUE I.  THE EVIDENCE PROVIDED BY THE STATE
> IN ITS CASE IN CHIEF, EXCLUDING INADMISSIBLE
> (PURSUANT TO THE CORPUS DELICTI RULE)
> TESTIMONY OF AN OUT OF COURT ALLEGED ADMISSION

---

[2] Respondents assert, and this Court agrees, that this action was timely filed within the federal one-year limitations period.  Thus, the Court will summarize only the state court procedural history that is relevant to the grounds raised in the Amended Petition before this Court.

> MADE TO POLICE BY APPELLANT, IS INSUFFICIENT TO ESTABLISH THE PRIMA FACIE REQUIREMENTS FOR A CONVICTION FOR POSSESSION OF A FIREARM BY A CONVICTED FELON.
>
> ISSUE II.   THE   LOWER   COURT   WAS   CLEARLY ERRONEOUS IN FINDING THAT THE APPELLANT ORALLY CONSENTED TO THE SEARCH OF THE HOME HE WAS STAYING AT.
>
> ISSUE III.  APPELLANT'S TRIAL DEFENSE COUNSEL PROVIDED APPELLANT WITH INEFFICIENT ASSISTANCE OF COUNSEL BECAUSE, PRIMARILY, SHE DID NOT OBJECT, PURSUANT TO THE CORPUS DELICTI RULE, TO OFFICER TODD'S TESTIMONY ABOUT AN ALLEGED SELF-INCRIMINATING   STATEMENT   MADE   BY   THE APPELLANT BEFORE IT WAS ESTABLISHED BY THE STATE THAT A CRIME HAD BEEN COMMITTED.

Ex. F at i.

On March 28, 2000, the First District Court of Appeal per curiam affirmed the judgment of conviction without issuing a written opinion.  Ex. H at 2.  The mandate issued on May 18, 2000. Id. at 1.

On October 22, 2003, the Petitioner filed a motion for post-conviction relief pursuant to Fla. R. Crim. P. 3.850, in which he contended that he received ineffective assistance of counsel for counsel's failure to: (1) object to Officer Todd's testimony regarding Petitioner's inculpatory statement because the state had not yet established that a crime had been committed; and, (2) investigate and call Dorothy Polite and Joyce Chisolm as defense witnesses.  Ex. L.  After conducting an evidentiary hearing, the trial court entered an order denying the motion.  Ex. M. Petitioner appealed, and on August 23, 2004, the First District

3

Court of Appeal per curiam affirmed the trial court's order, without issuing a written opinion. Ex. Q at 2. The mandate issued on October 8, 2004. Id. at 1.

### III. Evidentiary Hearing

This Court has carefully reviewed the record and concludes Petitioner is not entitled to an evidentiary hearing. A habeas corpus petitioner is entitled to an evidentiary hearing in federal court if he alleges facts which, if proven, would entitle him to habeas corpus relief. Smith v. Singletary, 170 F.3d 1051, 1053-54 (11th Cir. 1999) (citation omitted); Cave v. Singletary, 971 F.2d 1513, 1516 (11th Cir. 1992) (citing Townsend v. Sain, 372 U.S. 293 (1963)). Here, the pertinent facts of the case are fully developed in the record before the Court. The Court can "adequately assess [Petitioner's] claim[s] without further factual development." Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), cert. denied, 541 U.S. 1034 (2004). Therefore, an evidentiary hearing will not be conducted by this Court.

### IV. Standard of Review

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-132, 110 Stat. 1214 (hereinafter AEDPA). Since this action was filed after the effective date of AEDPA, the Court will analyze Petitioner's claim under 28 U.S.C. § 2254(d), as amended by AEDPA. Nelson v. Alabama, 292 F.3d 1291, 1294-95 (11th Cir. 2002), cert.

denied, 538 U.S. 926 (2003); <u>Fugate v. Head</u>, 261 F.3d 1206, 1215
n.10 (11th Cir. 2001), <u>cert</u>. <u>denied</u>, 535 U.S. 1104 (2002); <u>Wilcox
v. Florida Dep't of Corr.</u>, 158 F.3d 1209, 1210 (11th Cir. 1998),
<u>cert</u>. <u>denied</u>, 531 U.S. 840 (2000).

The Eleventh Circuit has described the standard of review
under AEDPA and has explained:

> The Anti-Terrorism and Effective Death
> Penalty Act of 1996 (AEDPA) governs this
> [action] and limits our review of the
> decisions of the state courts:
>
>> A federal court may not grant a
>> petition for a writ of habeas corpus
>> to a state prisoner on any claim
>> that has been adjudicated on the
>> merits in state court unless the
>> adjudication (1) resulted in a
>> decision that was contrary to, or
>> involved an unreasonable application
>> of clearly established federal law,
>> or (2) resulted in a decision that
>> was based on an unreasonable
>> determination of the facts in light
>> of the evidence presented in state
>> court.
>
> <u>Clark v. Crosby</u>, 335 F.3d 1303, 1307-08 (11th
> Cir. 2003) (citations omitted). A general
> framework of substantial deference governs our
> review of every issue that the state courts
> have decided:
>
>> [A] state-court decision can be
>> "contrary to" this Court's clearly
>> established precedent in two ways.
>> First, a state-court decision is
>> contrary to this Court's precedent
>> if the state court arrives at a
>> conclusion opposite to that reached
>> by this Court on a question of law.
>> Second, a state-court decision is
>> also contrary to this Court's

> precedent if the state court
> confronts facts that are materially
> indistinguishable from a relevant
> Supreme Court precedent and arrives
> at a result opposite to ours.
>
> . . . .
>
> [A] state-court decision can
> involve an "unreasonable
> application" of this Court's clearly
> established precedent in two ways.
> First, a state-court decision
> involves an unreasonable application
> of this Court's precedent if the
> state court identifies the correct
> governing legal rule from this
> Court's cases but unreasonably
> applies it to the facts of the
> particular state prisoner's case.
> Second, a state court decision also
> involves an unreasonable application
> of this Court's precedent if the
> state court either unreasonably
> extends a legal principle from our
> precedent to a new context where it
> should not apply or unreasonably
> refuses to extend that principle to
> a new context where it should apply.

> Williams v. Taylor, 529 U.S. 362, 405-07, 120
> S.Ct. 1495, 1519-20, 146 L.Ed.2d 389 (2000).

Diaz v. Sec'y for the Dep't of Corr., 402 F.3d 1136, 1141 (11th

Cir.), cert. denied, 126 S.Ct. 803 (2005).

The Eleventh Circuit addressed the application of the

"contrary to" clause in reviewing a state court adjudication:

> In applying the "contrary to" prong of
> AEDPA, we have recognized that where no
> Supreme Court precedent is on point, "we
> cannot say that the state court's conclusion
> . . . is contrary to clearly established
> Federal law as determined by the U.S. Supreme

6

Court." <u>McIntyre v. Williams</u>, 216 F.3d 1254, 1258 (11th Cir. 2000).

<u>Washington v. Crosby</u>, 324 F.3d 1263, 1265 (11th Cir.), <u>cert</u>. <u>denied</u>, 540 U.S. 965 (2003).

Under 28 U.S.C. § 2254(d)(2), this Court must determine whether the state court's adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Furthermore, AEDPA "also directs that a presumption of correctness be afforded factual findings of state courts, which may be rebutted only by clear and convincing evidence. <u>See</u> <u>id</u>. at § 2254(e)(1). This presumption of correctness applies equally to factual determinations made by state trial and appellate courts." <u>Bui v. Haley</u>, 321 F.3d 1304, 1312 (11th Cir. 2003) (footnote omitted) (citing <u>Sumner v. Mata</u>, 449 U.S. 539, 547 (1981)).

Finally, for a state court's resolution of a claim to be an adjudication on the merits, so that the state court's determination will be entitled to deference for purposes of federal habeas corpus review under AEDPA, all that is required is a rejection of the claim on the merits, not an opinion that explains the state court's rationale for such a ruling. <u>Wright v. Sec'y for the Dep't of Corr.</u>, 278 F.3d 1245, 1255 (11th Cir. 2002), <u>cert</u>. <u>denied</u>, 538 U.S. 906 (2003). <u>See</u> <u>Peoples v. Campbell</u>, 377 F.3d 1208, 1227 (11th Cir. 2004), <u>cert</u>. <u>denied</u>, 125 S.Ct. 2963 (2005). Thus, to the

extent that Petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under the new § 2254(d).

## V. The Trial Proceedings

In the answer brief filed in Petitioner's direct appeal, the state thoroughly summarized the evidence presented at trial and the trial proceedings as follows:

> At trial, Officer Todd testified that he was dispatched to the residence on 9-19-98 [in] reference [to] a husband and wife disturbance. (V4,[3] 165). He met with Ms. Jolly who informed him that she was leaving her husband and wanted assistance in moving out. (V4, 166). She informed them[4] that there may be a gun at the scene. (V4, 167). In such cases, it is police policy to secure the weapon for safety reasons; he attempted to do so in this case, but did not know the location of the firearm. (V4, 168). Officer Todd also learned that the defendant may be a convicted felon and knew it was a crime for a convicted felon to be in possession of a weapon. (V4, 168).
>
> They asked Ms. Jolly for permission to search the house; she signed a consent to search form while outside. (V4, 169, 182). They then spoke to the defendant who orally consented to the search; he was offered the opportunity to sign a consent form. (V4, 169, 182-83). They also asked the defendant whether there was a firearm in the house and he denied having any weapons or guns in the house. (V4, 169-70, 182). Officer Todd searched the house, while Officer Cusati searched a shed at the rear of the home where

---

[3] Counsel cites the trial transcript, which has been provided to this Court as Ex. D.

[4] Officer Cusati accompanied Officer Todd to the scene. Ex. D at 170.

Ms. Jolly stated the gun had been kept in the past. (V4, 170-72). The defendant, Ms. Jolly, and various others were present at the house. (V4, 170).

While Officer Todd searched, the defendant was in the same room. (V4, 172). In the master bedroom, he found the firearm under some folded linens in the drawer of an armoire. (V4, 172, 184). The defendant was coming towards Todd as Todd found the weapon. (V4, 174). Todd handcuffed the defendant and detained him based upon the fact that he might be a convicted felon. (V4, 174). After placing him in the rear of the patrol car, Todd read the defendant his Miranda[5] rights; the defendant indicated his understanding of them. (V4, 175-76, 188). The defendant was not under arrest at that point in time and he would have been let go, had they learned he was not a convicted felon or had someone else at the scene claimed ownership of the gun. (V4, 188, 191).

After advising the defendant of his rights, Officer Todd asked the defendant if he knew about and where he purchased the gun. (V4, 176). The defendant told Todd that he had purchased the gun from a man in the area, but could not provide his name or whereabouts. (V4, 176). The gun was loaded. (V4, 176).

On cross-examination, Officer Todd testified that upon their arrival, he told Ms. Jolly they could stand by for a few minutes to allow her to gather her personal possessions, but that they could not wait for her to remove furniture. (V4, 178). They did not know who owned the house or how long she actually stayed there. (V4, 179). They did not know who owned the armoire or how long it had been in the house. (V4, 186).

Officer Cusati was dispatched to the call with Officer Todd, his partner. (V4, 195).

---

[5] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

He spoke with the complainant who indicated she resided at that address and who wanted protection while retrieving property from the house. (V4, 196). He learned that a gun might be at the residence, so they sought to secure the scene and ensure it was not used against anyone. (V4, 196-97). Consent to search the home was obtained from the complainant and the suspect. (V4, 197). Officer Cusati searched the shed at the back of the house after being advised by the complainant that the gun was there. (V4, 197). His search was cut short when he was called to assist his partner. (V4, 198). When Cusati reached the house he found the defendant against the wall and Todd pointing to an armoire where he found the weapon. (V4, 199). Cusati took the weapon into custody and later submitted it for analysis. (V4, 200).

On cross-examination, Officer Cusati stated that he spoke with the defendant who stated it was okay to search the house. (V4, 208). Although Officer Todd asked the defendant to sign a consent to search form, he did not do so. (V4, 209).

David Warniment, a firearms examiner from FDLE [(the Florida Department of Law Enforcement)], found the gun to be in working order. (V4, 217-21).

The defendant moved for judgment of acquittal based upon the fact that the evidence was insufficient to establish that he was in actual or constructive possession of the firearm, since the State failed to prove he knew the gun was there or exercised control over the area where it was found. (V4, 222-24). The defendant contended that the court could not consider statements made by the defendant to prove the corpus delicti of the crime. (V4, 224). The court noted that no objection to the statement at the time it was introduced on this basis was made. (V4, 224). The prosecutor argued that the corpus delicti rule required only some proof that a crime had occurred and in this case, a gun was found in

the home, regardless of the defendant's statement. (V4, 225). The court denied the motion. (V4, 226-27).

Prior to the resumption of testimony, the court instructed the jury that the parties had stipulated that the defendant had previously been convicted of a felony on 5-27-88. (V4, 234). The State rested, and the defense renewed all prior motions. (V4, 234).

The defendant called FDLE crime analyst John Wilson who testified that fingerprints on the gun were not consistent with those of the defendant. (V4, 235-40).

On cross-examination, Wilson stated it was possible for an individual to touch an object and not leave prints. (V4, 241-42).

Evelyn Jackson, the defendant's mother, testified that she owned the residence in question. (V4, 256). Otis Huff lived there in July, the defendant lived there around the second week of August, and Huff and Raymond Cobbs live there now. (V4, 256). During all these times, the house was fully furnished with her things. (V4, 257). Ms. Jackson identified her armoire or chiffonier. (V4, 261-63). She asserted the defendant did not have any clothes in it; she put linens in the drawer. (V4, 264-65). Jackson never saw the defendant with a gun; they never talked of guns. (V4, 266).

Ms. Jolly lived at the house, with the defendant, the last part of August. (V4, 265). Jackson went to the house after receiving a call that the defendant was in jail and Ms. Jolly was moving out. (V4, 265). Upon her arrival, Jolly and some of her family were moving Jolly's things and some of Jackson's things out of the house. (V4, 266). No one asked for her consent to search the house. (V4, 270).

On cross-examination, Ms. Jackson testified that Otis Huff left things in the

11

house and armoire when he moved out before the
defendant moved in.  (V4, 267-68).  She did
not recall seeing the defendant with a firearm
7-10 days prior to his arrest.  (V4, 268).
She was not present at the house when Ms.
Jolly or the police arrived and had no
knowledge of any statements the defendant made
to police.  (V4, 268-69).  Ms. Jackson had no
personal knowledge of whether the defendant
ever possessed a firearm or had possession of
one at that time.  (V4, 269).  She did not
want anything bad to happen to her son.  (V4,
269-70).

Otis Huff testified that he lived in the
house off and on since 1994.  (V4, 272).  He
recognized most of the items in the armoire as
belonging to him.  (V4, 272).  Huff claimed he
owned the .22 or .25 automatic which was given
to him as collateral for a loan.  (V4, 273).
Huff claimed the person who gave him the gun
told him it was inoperable and had never been
fired.  (V4, 273).   To his knowledge, the
defendant did not know the gun was there,
because Huff never had any reason to talk
about it.  (V4, 273).

On cross-examination, Huff stated that he
never tried to fire the gun which was not
loaded.  (V4, 274).  The clip was separate
from the gun.  (V4, 275).  The last time he
saw the gun was July of 1998; he had no idea
what happened to it since then.  (V4, 277-78).
Huff conceded it was possible that the
defendant had taken possession of the gun
after that time.  (V4, 278).  He had no idea
whether the defendant was in possession of a
firearm on 9-19-98.  (V4, 281).

Huff got the gun from someone named
Robert, whose last name he did not know.  (V4,
276).  Robert was described as a black male,
about as tall as Huff, who weighed 200 pounds.
(V4, 276).   Huff believed Robert could be
located in jail; Huff found Robert on the east
side of town.  (V4, 277).  Huff admitted two
prior felony convictions and at least three
crimes involving dishonesty.  (V4, 277, 281).

Huff did not want the defendant, who was his cousin, to be convicted.  (V4, 280).

The defendant renewed the motion for judgment of acquittal at the close of all of the evidence, asserting that the State failed to prove the defendant had actual or constructive possession of the firearm.  (V4, 285-86).  The trial court again denied the motion.  (V4, 288).

In rebuttal, the State called Vanessa Price f/n/a Vanessa Jolly.  (V4, 289).  She testified that she had been married to the defendant for a period of five months during which time they resided in a number of homes.  (V4, 290).  When she and the defendant had a disagreement she moved out of their house on Daniel Street and the defendant moved into his mother's house; when they worked things out, she moved in with the defendant there.  (V4, 291).  She lived there with the defendant and her two minor children; Huff did not live there.  (V4, 292).  She was not aware of any property that Huff left at the house when he moved out.  (V4, 293).  The defendant kept his clothes, letters and other property in the armoire in the bedroom they shared together; the defendant also kept the gun there, the first time she saw it.  (V4, 294).  She has seen the defendant in possession of the gun and has seen it in his hand.  (V4, 294-95).  Ms. Jolly saw the defendant with the gun on two occasions, once when he took it out of the shed where he kept his belongings; Ms. Jolly did not know if it was loaded.  (V4, 298-99).  The defendant's mother was present on this occasion and was in a position to see the defendant with the gun.  (V4, 299-300).  The second time she saw the defendant with a gun was one night while they were at home.  (V4, 300).  She described it as a small silver gun with white grips.  (V4, 300-02).  She identified the gun taken by the police as the one she saw the defendant with.  (V4, 303).

Ms. Jolly asked for a divorce on Thursday, 9-17.  (V4, 292).  She called the

police on the 19th to protect her while she
got her stuff so she could leave the
defendant. (V4, 303). She did so because her
sister was concerned because the defendant had
a gun. (V4, 304). She let the police know
that the defendant had a gun. (V4, 304).
When she got to the house, the defendant came
to the door, putting on a shirt as he went
around the side of the house to where the shed
was; he came back holding his hand in a
particular fashion. (V4, 304-05, 307). Ms.
Jolly believed the gun was out by the shed
because she had been looking for it; one day
she found it where he had left it out, but
after that it was not in the house again.
(V4, 305). When she asked him about it, he
told her he had moved it out of the house, but
did not say where. (V4, 306).

On cross-examination, Ms. Jolly stated
that she and her sister felt that they needed
to have the police there to retrieve her
things because it was not their property.
(V4, 311). She told the police that the
defendant had a gun before they told her that
they could not stay and babysit while she
moved. (V4, 312). She did not hear the
police ask the defendant if she could get her
things. (V4, 313). They asked her if they
could search after they had gone inside; she
was asked to sign the paper after the
defendant was handcuffed and in the back of
the patrol car. (V4, 314).

The armoire in which the defendant put
his things was there at the house; it belonged
to the defendant's mother. (V4, 315). There
were some clothes in it before the defendant
put his in it, but she did not know to whom
they belonged. (V4, 315-16). On the 19th,
Ms. Jolly did not see the defendant with the
gun. (V4, 317). She thought the gun was in
the shed because the defendant did not keep it
in the house any more. (V4, 320).

On re-direct, Ms. Jolly stated that she
did not know where the defendant got the gun,
but he had talked about getting one and said

14

someone he knew was going to sell him one. (V4, 318). She told the defendant's mother about it. (V4, 318). The defendant knew that she had called the police, because he told her that they didn't need to call the police. (V4, 319). When the police asked her about consent to search, she told them that she did not have any problems with it, that she just wanted to get her things and go. (V4, 319-20).

The defendant renewed his prior motions and the court relied upon its prior rulings. (V4, 321).

Evelyn Jackson was recalled to the stand and testified that she had never seen the gun before. (V4, 324). The defendant lived at the house from the second week of August until September 19th. (V4, 325). She was never called to the house because of an argument between the defendant and his wife; and she never saw the defendant leave with a gun after an argument. (V4, 325-26). The clothes depicted in photos of contents of the chiffonier belonged to Otis Huff. (V4, 326). Ms. Jolly never told her about a gun in the house; they did not speak often and were not really close. (V4, 327).

The jury found the defendant guilty of possession of a firearm by a convicted felon as charged. (V7, 437).

Ex. G at 11-19.

## VI. Findings of Fact and Conclusions of Law

### A. Ground One

Petitioner contends that the evidence submitted by the state in its case in chief (with the exception of Petitioner's inculpatory statement, which was inadmissible pursuant to the *corpus delicti* rule) was insufficient to establish the elements of

15

the crime charged.  Specifically, he contends that there was no proof that he had constructive possession of the firearm, other than his own inculpatory statement.

Respondents contend, and this Court agrees, that this ground is procedurally barred.  Although this claim was presented on direct appeal, the issue was not properly raised on direct appeal because it was not preserved for appellate review.  See Response at 6-8.

Respondents also contend that, insofar as Petitioner asserts that his inculpatory statement was admitted in violation of Florida law, this issue presents an issue of state law that is not cognizable on federal habeas review.  This Court agrees with Respondents' contention.  See Response at 8-9.  Clearly, "[s]uch a state rule of 'corpus delicti' has no independent constitutional footing." Autry v. Estelle, 706 F.2d 1394, 1407 (5th Cir. 1983) (citation omitted).

Even assuming arguendo that Petitioner exhausted a federal sufficiency of the evidence claim, he is not entitled to relief. The Due Process Clause of the Fourteenth Amendment requires the state to prove beyond a reasonable doubt each element of the offense charged. Thompson v. Nagle, 118 F.3d 1442, 1448 (11th Cir. 1997)(citing Jackson v. Virginia, 443 U.S. 307, 314 (1979)), cert. denied, 522 U.S. 1125 (1998).  "[T]his court must presume that conflicting inferences to be drawn from the evidence were resolved

by the jury in favor of the State." Thompson v. Nagle, 118 F.3d at 1448 (citing Machin v. Wainwright, 758 F.2d 1431, 1435 (11th Cir. 1985)).  The relevant question is whether any rational jury, after viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the charged offenses beyond a reasonable doubt.  Thompson, 118 F.3d at 1448.

Upon review of the record, it is clear that the state presented sufficient evidence on each element of the charge of possession of a firearm by a convicted felon.  See Response at 9-14.  Thus, Petitioner's insufficiency claim is clearly without merit.

As a final matter, this Court notes that, under federal law, Petitioner's *corpus delicti* issue is also without merit.  "[T]he *corpus delicti* of a crime may not be established solely by the uncorroborated confession of an accused."  United States v. Raffone, 693 F.2d 1343, 1346 (11th Cir. 1982) (citing Wong Sun v. United States, 371 U.S. 471, 488-89 (1963)), cert. denied, 461 U.S. 931 (1983).

> Although an accused may not be convicted on his own uncorroborated confession, the corroborated evidence does not have to prove the offense beyond a reasonable doubt "as long as there is substantial independent evidence that the offense has been committed and the evidence proves beyond a reasonable doubt that the defendant is guilty."  Smith v. U.S., 348 U.S. 147, 156, 75 S.Ct. 194, 199, 99 L.Ed. 192 (1954). . . .

Fallada v. Dugger, 819 F.2d 1564, 1570 (11th Cir. 1987).

17

In this case, it is clear that there was substantial independent evidence that the offense had been committed. <u>See</u> Response at 11-13. Furthermore, as noted previously, the evidence presented at trial was sufficient for the jury to find Petitioner guilty of the charged offense beyond a reasonable doubt. <u>See id</u>. at 9-14. Thus, for all of the above-stated reasons, Petitioner is not entitled to relief on the basis of this claim.

## B.  Ground Two

As noted previously, Petitioner contends that he received ineffective assistance of counsel for counsel's failure to object to Officer Todd's testimony regarding Petitioner's inculpatory statement because the state had not yet established that a crime had been committed.  "The Sixth Amendment guarantees criminal defendants effective assistance of counsel.  That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (citations omitted).  The Eleventh Circuit captured the essence of an ineffectiveness claim:

> [A] petitioner must show that his lawyer's performance fell below an "objective standard of reasonableness" and that the lawyer's deficient performance prejudiced the petitioner. <u>See Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).  Establishing these two elements is not easy:  "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few

18

and far between." <u>Waters v. Thomas</u>, 46 F.3d
1506, 1511 (11th Cir. 1995) (en banc) (quoting
<u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir.
1994)).

For assessing a lawyer's performance,
<u>Chandler v. United States</u>, 218 F.3d 1305 (11th
Cir. 2000) (en banc) <u>cert</u>. <u>denied</u>, 531 U.S.
1204, 121 S.Ct. 1217, 149 L.Ed.2d 129 (2001),
sets out the basic law: "Courts must indulge
the strong presumption that counsel's
performance was reasonable and that counsel
made all significant decisions in the exercise
of reasonable professional judgment." <u>Id</u>. at
1314 (internal marks omitted). . . . Our role
in reviewing an ineffective assistance claim
is not to "grade" a lawyer's performance;
instead, we determine only whether a lawyer's
performance was within "the wide range of
professionally competent assistance." <u>See</u>
<u>Strickland</u>, 104 S.Ct. at 2066.

The inquiry into whether a lawyer has
provided effective assistance is an objective
one: a petitioner must establish that no
objectively competent lawyer would have taken
the action that his lawyer did take." <u>See</u>
<u>Chandler</u>, 218 F.3d at 1315. . . .

A petitioner's burden of establishing
that his lawyer's deficient performance
prejudiced his case is also high. "It is not
enough for the [petitioner] to show that the
errors had some conceivable effect on the
outcome of the proceeding. Virtually every
act or omission of counsel would meet that
test." <u>Strickland</u>, 104 S.Ct. at 2067.
Instead, a petitioner must establish that a
reasonable probability exists that the outcome
of the case would have been different if his
lawyer had given adequate assistance. <u>See</u> <u>id</u>.
at 2068.

<u>Van Poyck v. Florida Dep't of Corrections</u>, 290 F.3d 1318, 1322-23

(11th Cir. 2002) (per curiam) (footnotes omitted), <u>cert</u>. <u>denied</u>,

537 U.S. 812 (2002), 537 U.S. 1105 (2003).

In sum, "[w]ithout proof of both deficient performance and prejudice to the defense, . . . it could not be said that the sentence or conviction 'resulted from a breakdown in the adversary process that rendered the result of the proceeding unreliable,' and the sentence or conviction should stand."   Bell v. Cone, 535 U.S. 685, 695 (2002) (internal citation omitted) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)).

Petitioner raised this ineffectiveness claims in a motion for post-conviction relief, and after conducting an evidentiary hearing, the trial court adjudicated the claims as follows:

> This matter came before this Court on the Defendant's Second Amended Motion for Post Conviction Relief filed on October 22, 2003. An evidentiary hearing was held on October 22, 2003.  The hearing was transcribed and is attached as an exhibit to this Order.
>
> On March 1, 1999, following a jury trial, the Defendant was convicted of Possession of a Firearm by a Convicted Felon and was sentenced as a Habitual Felony Offender to a term of eleven (11) years of incarceration. (Exhibit "A.")  The Defendant's conviction and sentence were affirmed on appeal through a Mandate issued on May 18, 2000.  (Exhibit "B.")
>
> In the instant Motions [sic], the Defendant raises two grounds for relief premised upon claims of ineffective assistance of counsel. In order to prevail on a claim of ineffective assistance of counsel, the Defendant must show that: (1) counsel's performance was outside the wide range of reasonable professional assistance, and (2) counsel's deficient performance prejudiced the defense, that is, that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's

deficient      performance.      <u>Strickland   v.
Washington</u>, 466 U.S. 668, 687 (1984); <u>Cherry
v. State</u>, 659 So.2d 1069, 1072 (Fla. 1995).
Further, the "standard is reasonably effective
counsel, not perfect or error-free counsel."
<u>Coleman v. State</u>, 718 So.2d 827, 829 (Fla. 4th
DCA 1998). A claim of ineffective assistance
of counsel will warrant an evidentiary hearing
only where the Defendant alleges "specific
facts which are not conclusively rebutted by
the record and which demonstrate a deficiency
in performance that prejudiced the defendant."
<u>Roberts v. State</u>, 568 So.2d 1255, 1259 (Fla.
1990). Further, "[t]o establish prejudice [a
defendant] 'must show that there is a
reasonable probability that, but for counsel's
unprofessional errors, the result of the
proceeding would have been different. A
reasonable probability is a probability
sufficient to undermine confidence in the
outcome.'" <u>Valle v. State</u>, 778 So.2d 960,
965-66 (Fla. 2001).

In the Defendant's first ground for
relief, he alleges that counsel rendered
ineffective assistance by failing to object,
pursuant to the corpus delicti rule, to
Officer John Todd's testimony about an
incriminating statement made by the Defendant
prior to the State establishing that a crime
had been committed. In order to establish the
prima facie corpus delicti of Possession of a
Firearm by a Convicted Felon the State must
prove that a defendant is a convicted felon
and that he or she knowingly owned or had a
firearm in his or her care, custody,
possession, or control. <u>See</u> <u>Garmon v. State</u>,
772 So.2d 43 (Fla. 4th DCA 2000). The
Defendant's contention that his incriminating
statement was admitted prior to the State
proving the corpus delicti is without merit.

Initially, this Court notes that the
Defendant's status as a convicted felon was
first revealed to the jury during voir dire
and at trial following the Defendant's Motion
for Judgment of Acquittal. (Exhibits "C,"
page 17, "D," pages 222-234.) Officer Todd

21

testified that he was called out to a domestic
disturbance involving the Defendant and his
wife. (Exhibit "D," page 165.) Officer Todd
testified that he was informed by the
Defendant's wife, Ms. Jolly, that there may
have been a firearm in their home and that the
Defendant was a convicted felon. (Exhibit
"D," pages 167-168.) Officer Todd testified
that Ms. Jolly gave oral and written consent
to search the house and that the Defendant
gave oral consent stating that there were no
weapons in the house. (Exhibit "D," pages
169-170.) Officer Todd testified that his
search of the house led him to the bed room
where he found a firearm under some sheets or
blankets in a drawer. (Exhibit "D," page
172.) Officer Todd testified that he
immediately detained the Defendant and read
the <u>Miranda</u> warnings. (Exhibit "D," pages
174-176.) Finally, Officer Todd testified
that the Defendant stated he purchased the
firearm from a man in the area but could not
tell him the man's name or whereabouts.
(Exhibit "D," page 176.)

The State had established the corpus
delicti for Possession of a Firearm by a
Convicted Felon prior to admitting the
Defendant's incriminating statement.
Additionally, the Defendant stipulated that he
was a convicted felon prior to the admission
of his statement at trial. Further, the
Defendant's consent to the search of the house
established that the firearm was in his care,
custody, possession, or control[.]
Accordingly, the Defendant's claim is without
merit.

Ex. M at 1-3.

This claim was rejected on the merits by the trial court and

the trial court's decision was affirmed on appeal. <u>See</u> Ex. Q.

Thus, there are qualifying state court decisions from both the

state trial and appellate courts. The Court must next consider the

"contrary to" and "unreasonable application" components of the statute. "It is the objective reasonableness, not the correctness per se, of the state court decision that we are to decide." Brown v. Head, 272 F.3d 1308, 1313 (11th Cir. 2001), cert. denied, 537 U.S. 978 (2002).

Upon a thorough review of the record and the applicable law, it is clear that the state courts' adjudications of this claim were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Petitioner is not entitled to relief on this claim.

This Court also finds this claim to be without merit for the reasons stated by the Respondents in their Response. See Response at 14-19. Thus, for the above-stated reasons, the Amended Petition will be denied, and this case will be dismissed with prejudice.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1. The Amended Petition is **DENIED**, and this action is **DISMISSED WITH PREJUDICE.**

2. The Clerk of the Court shall enter judgment denying the Amended Petition and dismissing this case with prejudice.

3.   The Clerk of the Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this _31st_ day of
May, 2006.


HOWELL W. MELTON
United States District Judge


ps 5/22
c:
Keith Lamar Jolly
Ass't Attorney General Bryan Jordan